IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KIRK H. DEMEYER                                                    PLAINTIFF

        v.                        Civil No. 10-5092

SHERIFF KEITH FERGUSON;
DR. HUSKINS; LT. CARTER;
and CAPTAIN ROBERT HOLLY                                       DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

        This is a civil rights case filed by the Plaintiff pursuant to the provisions of 42 U.S.C. §

1983.  Plaintiff proceeds *pro se* and *in forma pauperis.*

        Plaintiff is currently incarcerated in the Varner Unit of the Arkansas Department of

Correct (ADC).  The events that are the subject of this action occurred while Plaintiff was

incarcerated in the Benton County Detention Center (BCDC) from November 12, 2009, to

November 23, 2010.   Plaintiff claims his constitutional rights were violated in the following

ways:  he was denied adequate medical care; he was subjected to unconstitutional conditions of

confinement; and he was denied access to the courts.

        A motion for summary judgment has been filed on behalf of Defendants (Docs. 23, 24

& 25).  To assist Plaintiff in responding to the summary judgment motion, a questionnaire was

prepared (Doc. 31).  On August 25, 2011, Plaintiff filed his response to the questionnaire (Doc.

34).  The motion is now ready for decision.   On August 29, 2011, Plaintiff filed affidavits in

support of his response (Doc. 35).

### 1.  Background

        Plaintiff was booked into the BCDC on November 12, 2009, on a pending criminal

charge. *Plaintiff's Response* (Doc. 34) at ¶ 1 (hereinafter *Resp.*).  At the time, he was already

serving a term of imprisonment in the ADC.  *Id.* at ¶ 4.  He remained incarcerated at the BCDC until he was transferred back to the ADC on November 23, 2010.

When Plaintiff was booked in, he completed a medical questionnaire.  *Resp.* at ¶ 4; *Defendants' Exhibit* 2 (hereinafter *Defts' Ex.*).  He indicated he was under the care of a doctor at the Varner Unit of the ADC, was allergic to penicillin, and had a heart condition.  *Id.*  In responding to the summary judgment motion, Plaintiff indicates he has high blood pressure. *Resp.* at ¶ 4.

On December 14th, he submitted a medical request because his elbows were dry.  *Resp.* at ¶ 5(A).  The following day, the nurse prescribed hydrocortisone cream for three days.  *Id.* at ¶ 5(B).  On December 21st, Plaintiff submitted a medical request complaining that three days of hydrocortisone cream were not enough and that his elbows were still dry, cracking, and sore.  *Id.* at 6(A).  The nurse responded that Plaintiff should keep his elbows clean and dry.  *Id.* at ¶ 6(B). Plaintiff states he did keep his elbows clean and dry but they were still drying and cracking from leaning on the tables all day.  *Id.*  Plaintiff also states the air was dry and he had very little to drink causing him to become dehydrated.  *Id.*  According to Plaintiff, the drinking fountain only stayed on for two seconds.  *Id.*  By the time he got his head down to drink, the fountain was off. *Id.*

On December 23rd, Plaintiff asked to see the doctor about getting medication for anxiety attacks.  *Resp.* at ¶ 7(A).  He said his mind would not shut down long enough for him to even play a game.  *Id.*  In response, Plaintiff was seen by Dr. Huskins on December 26th.  *Id.* at ¶ 7(C).  Dr. Huskins noted that Plaintiff's affect was good.  *Id.*; *Defts' Ex.* 3 at pg. 6.  Dr. Huskins did not prescribe any medication.  *Id.*  Nurse Hartgraves provided Plaintiff with some Vaseline

-2-

for his lips. *Resp.* at ¶ 7(D).

On January 7, 2010, Plaintiff submitted a medical request stating that there was blood in his stool and he was "gasier" than normal. *Resp.* at ¶ 8(A).  Plaintiff was seen by Dr. Huskins on January 8th. *Id.* at ¶ 8(B).  He prescribed hemorrhoid cream twice a day for five days. *Id.* Dr. Huskins told Plaintiff to follow-up if he had any more symptoms. *Id.* Plaintiff notes that while he was seen by the doctor no examination occurred and he was not told to follow-up if he still had symptoms. *Id.* Plaintiff asserts that he had hemorrhoids in the past and that was not his current problem. *Id.*

On January 11th, Plaintiff asked for a diet change. *Resp.* at ¶ 9(A).  He said the food did not agree with his digestive system. *Id.* In response, the nurse indicated they could treat Plaintiff for stomach upset. *Id.* at ¶ 9(B).  She asked if he needed something for that. *Id.* Plaintiff did not ask for stomach medicine. *Id.* at ¶ 9(C).  He indicates he did not have an upset stomach but instead had blood mixed with his stool. *Id.* As a result, he said his stomach ached and he had rectal pain. *Id.*

On January 12th, Plaintiff submitted a medical request stating he had a runny nose, blocked sinuses, headache, sore throat, and cough. *Resp.* at ¶ 10.  In response, Nurse Hartgraves prescribed Sudafed and tussin. *Id.*

On February 13th, Plaintiff submitted a medical request stating he was getting frequent headaches. *Resp.* at ¶ 11(A).  He asked if he could get the medication when he needed it or whether he had to put in a medical request. *Id.* In response, he was told the medication had been ordered and if he did not want, or need, it not to take it at med call. *Id.* at ¶ 11(B).

On February 16th, he had a headache and were prescribed 400 mg. of ibuprofen for five

Case 5:10-cv-05092-JLH   Document 36   Filed 08/30/11   Page 4 of 16 PageID #: 332

days. *Resp.* at ¶ 12. On February 24th, Plaintiff submitted a request complaining of a sore throat, cough, stuffy nose, and headache. *Id.* at ¶ 13(A). He was seen by Dr. Huskins on February 26th and was prescribed Tylenol and cough medicine for five days. *Id.* at ¶ 13(B).

On April 18th, Plaintiff submitted a request complaining of limited movement in his right shoulder and arm. *Resp.* at ¶ 14(A). Plaintiff stated that he had a hard time sleeping on his right side. *Id.* Plaintiff was seen by Dr. Huskins on April 19th; he noted a decreased range of motion in Plaintiff's shoulder. *Id.* at ¶ 14(B). Dr. Huskins prescribed 500 mg. of Tylenol to be taken two times per day for ten days. *Id.* That same day, Plaintiff submitted a medical request stating that the Tylenol was not going to work and he needed an anti-inflammatory and not to have to sleep on a hard surface. *Id.* at ¶ 14(C). In response, a note was made that Plaintiff had been seen by the doctor that day. *Id.* at ¶ 14(D).

On April 21st, Plaintiff complained that the Tylenol was not working and he needed 500 mg. of anti-inflammatory, three times a day, and not to sleep on a hard surface. *Resp.* at ¶ 15(A). In response, Nurse Hargraves responded that the medication had been ordered and he should talk to the deputy about another bunk if he had a boat.[1] *Id.* at ¶ 15(B). On April 22nd, Nurse Hartgraves discontinued the Tylenol and authorized Plaintiff to have Aleve, two times a day, for five days. *Id.* at ¶ 15(C).

On April 26th, Plaintiff stated his arm was still inflamed and he needed the medication to continue until he left the facility on June 11th. *Resp.* at ¶ 16(A). Plaintiff also asked for a thicker mat. *Id.* On April 28th, Plaintiff was seen by Dr. Huskins and prescribed Aleve.

---

[1]A boat is a type of portable bedding placed on the floor of a cell with a mattress and bedding. *See e.g., Hursh v. County of San Diego*, 2011 WL 2003353, *1 (S.D. Cal. May 23, 2011).

AO72A
(Rev. 8/82)

On May 2nd, Plaintiff requested a print out of the drug information for naproxen sodium. *Resp.* at ¶ 16(C). In response, Plaintiff was told "no." *Id.* at ¶ 16(D). He was informed he could refuse the medication or ask the nurse when he saw her. *Id.*

On June 27th, Plaintiff submitted a request stating that two weeks ago he had sent Dr. Huskins a medical request containing questions about why when he prescribed a medication with a dosage it was for less that the recommended dosage. *Id.* For example, Plaintiff said the recommended dosage on cough syrup was two tablespoons but he only received 1/4 teaspoon. *Id.* In response, he was told the doctor prescribed 5cc which is 1 tsp.

On July 13th, Plaintiff submitted a request stating that his arm and shoulder were still bothering him and he needed "something done for it." *Resp.* at ¶ 18(A). In response, Plaintiff was told medication had been ordered and asked whether he wanted to see the doctor. *Id.* at ¶ 18(B). According to Defendants, Nurse Hartgraves authorized Plaintiff to have Aleve, two times a day, for five days. *Id.* at ¶ 18(C). Plaintiff asserts he did not receive the Aleve. *Id.*

On July 17th, Plaintiff submitted a request asking to see the doctor. *Resp.* at ¶ 19(A). He indicated that he was experiencing numbness and pain all the way down his arm to his fingers. *Id.* He also stated his left hip was starting to bother him. *Id.* Plaintiff was seen by Dr. Huskins on July 21st and prescribed prednisone, three times a day, for five days. *Id.* at ¶ 19(B).

On August 20th, Plaintiff asked for another mat. *Resp.* at ¶ 20. He stated that the medication for his shoulder and hip was not working. *Id.* He also noted that Lt. Carter had told him to forward his complaint to the doctor. *Id.* Justin Waldron, Jim Suddreth, Stacy Gawlik, Levi Campbell and Zack Campbell, all who were incarcerated at the BCDC while Plaintiff was there, indicate there were multiple inmates sleeping on the floor including the Plaintiff. They

-5-

further indicate the mats were between one-half to one inch thick.

Plaintiff was seen on August 23rd, and Dr. Huskins noted lateral crepitus (grinding in the tendons) present in Plaintiff's shoulder which would cause pain. *Resp.* at ¶ 21(A). Dr. Huskins ordered an x-ray of Plaintiff's shoulder and prescribed 500 mg. of Tylenol, two times a day, for ten days. *Id.*; *Defts' Ex.* 3 at pgs. 3 & 8. Plaintiff states Dr. Huskins did not tell him what the "problem" was or even that he was going to order an x-ray. *Resp.* at ¶ 21(A). Moreover, Plaintiff states the Tylenol did not work on his pain and discomfort. *Id.* Additionally, he states he stopped getting the Tylenol on September 1st. *Id.*

On August 26th, Plaintiff's right shoulder was x-rayed and it showed arthritis in his shoulder. *Defts' Ex.* 3 at pg. 44. Dr. Huskins concluded an anti-inflammatory was the best way to treat Plaintiff's shoulder. *Id.* Plaintiff agrees an x-ray was taken but states he was not informed of the results. *Resp.* at ¶ 21(B).

On August 28th, Plaintiff submitted a request complaining of a head and chest cold. *Resp.* at ¶ 22(A). He asked for Sudafed and Robutusin. *Id.* On August 31st, Nurse Hartgraves prescribed Sudafed and cough medicine. *Id.* at ¶ 22(B).

On September 2nd, Plaintiff asked for a copy of his x-ray and the written results. *Resp.* at ¶ 23(A). In response, he was told they did not have that information. *Id.* On September 10th, Plaintiff submitted a second request for this information. *Id.* at ¶ 23(A). In response, Plaintiff was told that he would have to ask the sergeant about copies of his records. *Id.*

According to Dr. Huskins, he saw the Plaintiff on November 1st and noted he was still experiencing pain in his right shoulder. *Defts' Ex.* 3 at pgs. 4 &9. Dr. Huskins ordered another x-ray and prescribed prednisone, four times a day, for five days, and Tylenol, four times a day,

-6-

for five days.  *Id.*  Plaintiff denies being seen by Dr. Huskins and states he did not know he was

going to have another x-ray.  *Resp.* at ¶ 24(A).  Plaintiff's shoulder was x-rayed on November

3rd.  *Id.* at ¶ 24(B).  The x-ray revealed Plaintiff had arthritis.  *Defts' Ex.* 3 at pg. 4.    Dr.

Huskins decided anti-inflammatory medications were still the best course of treatment.  *Id.*

Plaintiff states Dr. Huskins did not go over the x-rays with him.  *Resp.* at ¶ 24(B).

     With the exception of the Aleve prescribed on April 22nd, Plaintiff received all

medication prescribed by Dr. Huskins.  *Id.*  The medications included:  hydrocortisone cream,

Vaseline, hemorrhoid cream, Sudafed, Tussin, ibuprofen, acetaminophen (Tylenol), naproxen

sodium (Aleve), and prednisone.  *Resp.* at ¶ 26(A).

     Dr. Huskins did not believe Plaintiff needed an additional mat, thicker mat, daytime mat,

or extra blankets.  *Resp.* at ¶ 26(C).  According to Plaintiff, on July 15th, Nurse Hartgraves told

him there was no such thing as an extra, or thicker, mat.  *Id.* at ¶ 26(D).  Plaintiff indicates he

then submitted a grievance and was told by Lt. Carter to forward the complaint to Dr. Huskins.

*Id.*   Yet, Plaintiff states when he asked Dr. Huskins on August 20th about an extra mat, he was

told to check with Lieutenant Carter about that.  *Id.*

     On March 12th, Plaintiff requested access to the law library and his request was

approved.  *Defts' Ex.* 5 at pg. 1.  Plaintiff indicates he was not allowed to go to the law library

until around March 24th.  *Resp.* at ¶ 27(A).  He indicates the law library consisted of a book cart

with four or five notebook binders and two piles of printouts of laws that were outdated.  *Id.* at

¶ 27(B).  He requested access to the law library again on March 29th and his request was

approved.  *Id.* at ¶ 28 (A).  However, Plaintiff states he could not obtain the information he

needed because of the inadequacy of the library.  *Id.* at ¶ 28(B).

-7-

On April 6th, Plaintiff asked to have his indigent form filled out and returned to him. *Resp.* at ¶ 29(A). Captain Holly responded that he had not seen the form. *Id.* The form was completed on April 23rd when Captain Holly personally came to see Plaintiff and sign it. *Id.* at ¶ 29(B).

Plaintiff was able to file this civil rights action while he was incarcerated at the BCDC. *Resp.* at ¶ 29(C). He was able to send and receive legal mail. *Id.* at ¶ 29(D).

Plaintiff indicates he was seeking access to the law library in connection with both a criminal and a civil case. *Resp.* at ¶ 29(E). Plaintiff states he had an attorney representing him on his federal case but was also trying to research his state case. *Id.* Because of the inadequate law library, Plaintiff maintains he missed his "window" for filing a Rule 37 petition with the Arkansas Supreme Court. *Id.* at ¶ 29(F). He indicates he only had ninety days to file the petition. *Id.* Plaintiff states he was convicted in September of 2009. *Id.* at ¶ 29(G).

Plaintiff submitted a grievance on May 15th because he was not allowed to keep an envelope his legal mail came in. *Resp.* at ¶ 30(A). In response, he was told he could keep the envelopes legal mail came in and that the shifts would be advised of this. *Id.* at ¶ 30(B). With this one exception, Plaintiff was allowed to keep the envelopes. *Id.* at ¶ 30(C).

On July 1st, Plaintiff asked for attorney Norwood's address. *Resp.* at ¶ 31. In response, he was told there were multiple Norwoods and asked which one he wanted the address for. *Id.*

On August 2nd, Plaintiff asked for copies of a number of cases and statutes. *Resp.* at ¶ 32(A). In response, he was told to refer legal questions to his attorney. *Id.* Plaintiff asked his attorney for the information but was told he could not do it. *Id.* at ¶ 32(B). The research Plaintiff requested was in connection with his state case. *Id.*

-8-

Once Lieutenant Carter learned Plaintiff had an attorney representing him on his federal charges, Plaintiff states that he was refused access to the law library on September 13, 2010. *Resp.* at ¶ 35 & pg. 79.

With respect to Captain Holly, Plaintiff maintains he allowed Lieutenant Carter and Dr. Huskins to continue doing "what was wrong." *Resp.* at ¶ 36.  In this regard, Plaintiff notes that Captain Holly was aware of the problems he was having because of grievances he submitted. *Id.*  Plaintiff states that this case revolves around four issues:  a denial of medical care; having to sleep on the floor; being refused an extra mattress; and not having access to an adequate law library.  *Id.*

With respect to Sheriff Ferugson, Plaintiff states he allowed Dr. Huskins, Lieutenant Carter, and Captain Holly to act unprofessionally and deprive inmates of "life's minimal necessities."  *Id.* at ¶ 37.  Plaintiff asserts that he was deprived of a bed and was forced to sleep on the floor for six to eight months with only a one inch thick mattress.  *Id.*  Plaintiff maintains sleeping on the floor caused injury to his right shoulder and hips.  *Id.*  *See also* ¶ 34(c).

Plaintiff was asked whether he believed Dr. Huskins showed deliberate indifference to his serious medical needs.  *Resp.* at ¶¶ 26(E) & 34(C).  Plaintiff asserts that Dr. Huskins believed he only had to provide medical care for conditions that were life-threatening or would cause permanent disability.  *Id.* at ¶ 26(E).   Plaintiff maintains the duty also extends to conditions resulting in pain and suffering.  *Id.*  He states he submitted nine medical requests regarding problems with his right shoulder.  *Id.* at ¶ 34(C).  He indicates he repeatedly told Dr. Huskins that the condition was causing him pain and discomfort and that the medication was not alleviating the pain.  *Id.*  Plaintiff states the condition limited his daily activities, caused him to

-9-

be unable to sleep comfortably, and was painful when showering.  *Id.*  Plaintiff suggests had Dr. Huskins authorized additional bedding for a medical reason it would have helped with his pain and suffering.  *Id.* at ¶ 26(E).

### 2.  Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a summary judgment motion, the Court cannot weigh the evidence or resolve disputed  issues of fact in favor of the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact.  To be material, a fact must affect the outcome of the suit under the governing law."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011)(internal quotation marks and citations omitted).

### 3.  Discussion

Defendants maintain they are entitled to judgment in their favor for the following reasons:  first, they maintain there is no evidence of deliberate indifference on their part to Plaintiff's serious medical needs;  second, they argue Plaintiff was subjected to no unconstitutional conditions of confinement;  third, they argue Plaintiff was not denied access to the courts;  and finally they argue Plaintiff can offer no proof of any actual physical injury.

### A.  Denial of Access to Medical Care

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claims of inadequate medical care under the deliberate indifference standard.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, plaintiff must prove

-10-

that defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Plaintiff concedes he was seen numerous times by Dr. Huskins.  However, he maintains each visit was only a few minutes long, frequently did not involve any type of physical examination, and almost universally ended in the prescription of only either acetaminophen or ibuprofen which were ineffective.  He points out that he complained of pain, discomfort, and limited motion in his right shoulder over a period of months with little result. He also states his requests for approval of a thicker mat were denied or ignored.

While medical personnel are given "considerable latitude . . . in the diagnosis and treatment of medical problems of inmates," *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) and a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation, *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and

-11-

citation omitted), I believe there is a genuine issue of material fact as to whether Dr. Huskins exhibited deliberate indifference to Plaintiff's serious medical needs.

The administration of inadequate treatment may constitute deliberate indifference to serious medical needs. *Nelson*, 603 F.3d at 449.   In this case, there is no evidence suggesting medical staff developed a treatment plan for what was a chronic condition.   There is nothing to suggest pain relieving medications other than over-the-counter acetaminophen or ibuprofen were considered.   Nothing in the record suggests medical personnel considered Plaintiff's complaints of pain to be exaggerated or not supported by his medical condition.

In this case, I believe there are genuine issues of fact as to whether each of the Defendants exhibited deliberate indifference to Plaintiff's serious medical needs.   While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. July 20, 2010)(citation omitted).   Captain Holly and Lieutenant Carter responded to the majority of Plaintiff's requests and grievances and therefore had actual knowledge of Plaintiff's serious medical needs, his complaints of inadequate treatment, and his requests for a thicker mat.

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical care and prescription medications.   County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff.   Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer

-12-

for whose conduct he or she shall be responsible.").

### B.   Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

While having an inmate sleep on the floor may be constitutionally permissible, *see e.g., Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996) (use of a floor mattress for thirteen nights not unconstitutional), consideration must be given to the totality of the circumstances including the length of time the inmate is forced to sleep on the floor and the health of the inmate. *See e.g.*, *A.J. by L.B. v. Kierst*, 56 F.3d 849, 855 (8th Cir. 1995)(sleeping on mattresses on the floor not unconstitutional when it was for only a relatively short period of time and then only when there was a special need).  In this case, Plaintiff maintains he slept of the floor for months on a one inch thick mattress and that his health was adversely impacted by the sleeping arrangements.  In such circumstances, I believe there is a genuine issue of material

-13-

fact as to whether Plaintiff was housed under unconstitutional conditions of confinement.

**C.  Access to the Courts**

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817 (1997)).  The right of access requires the provision of "prisoners with adequate law libraries or adequate assistance from persons trained in the law," *Bounds*, 430 U.S. at 828, to challenge their criminal charges, convictions, and sentences directly or collaterally or to challenge the conditions of their confinement through civil rights actions, *Casey*, 518 U.S. at 351; *see also Cody v. Weber*, 256 F. 3d 764, 767-68 (8th Cir. 2001)("right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court'")(*quoting Casey*, 518 U.S. at 354-55); *Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).

While Plaintiff was granted access to the law library on several occasions, his account of the contents, if accurate, suggest the library may have been woefully inadequate.  Defendants have not provided the Court with any information regarding the contents of the library.  Furthermore, Plaintiff was denied access to the library once it was determined he had an attorney representing him on his federal claim.  This is true despite the fact that Plaintiff informed Defendants that his attorney could only assist him in connection with his pending federal criminal case and could provide no assistance with his state criminal case or with civil matters.

-14-

Plaintiff asserts that he was prevented from filing a timely Arkansas Rules of Criminal Procedure Rule 37 petition with the Arkansas Supreme Court as a result of his lack of access to the legal materials.  This is precisely the type of harm the Constitutional requirement for legal assistance is designed to avoid.  *See e.g., Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)("The underlying harm that the Constitution requires . . . legal assistance programs to prevent is . . . a lost, rejected, or impeded legal claim").  Under the circumstances, I believe there are genuine issues of material fact that preclude summary judgment in Defendants favor on this claim.

### D.  Actual Injury

Defendants maintain they should be granted judgment as a matter of law because Plaintiff suffered no physical injuries as required by the Prison Litigation Reform Act (PLRA).  Codified as 42 U.S.C. § 1997e(e), section 803(d) of the PLRA provides as follows:  "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  They maintain this provision bars this suit.

Defendants have misinterpreted this statutory provision.  The provision limits the available damages in the absence of a physical injury but does not preclude a plaintiff from pursuing a claim.  *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004)(The physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners" but does not bar the recovery of nominal and punitive damages); *see also Pool v. Sebastian County*, 418 F.3d 934, 942 n.2 (8th Cir. 2005)(Section 1997e(e) presents an

-15-

issue of damages under the PLRA).

### 4.  Conclusion

For the reasons stated, I recommend that the summary judgment motion (Doc. 23) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of August 2011.

/s/ *J. Marschewski*

 HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

-16-