IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KIRK H. DEMEYER                                                              PLAINTIFF

v.                      Civil No. 10-5092

SHERIFF KEITH FERGUSON;
DR. HUSKINS; LT. CARTER;
and CAPTAIN ROBERT HOLLY                                   DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff pursuant to the provisions of 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in the Varner Unit of the Arkansas Department of Correct (ADC). The events that are the subject of this action occurred while Plaintiff was incarcerated in the Benton County Detention Center (BCDC) from November 12, 2009, to November 23, 2010. Plaintiff claims his constitutional rights were violated in the following ways: he was denied adequate medical care; he was subjected to unconstitutional conditions of confinement; and he was denied access to the courts.

An evidentiary hearing was held on March 13, 2012. The case is now before me for issuance of this report and recommendation.

### 1. Background

The Court heard testimony from the following witnesses: (1) Kirk H. Demeyer, the Plaintiff; (2) Timothy Suddreth; (3) Justin Waldron; (4) Stacy Gawlik; (5) Levi Campbell; (6) Zachary Campbell; (7) Lieutenant Paul Carter, a named Defendant; (8) Former Captain Robert Holly, a named Defendant; and (9) Dr. John Huskins, a named Defendant.

-1-

AO72A
(Rev. 8/82)

**Kirk Demeyer**

Demeyer testified he was incarcerated at the BCDC from November 12, 2009, until November 23, 2010. Initially, he was placed in pod D-150 but after he had some problems with a fellow inmate he was moved to pod D-149 and had to sleep on the floor. Demeyer believes he spent approximately four to five months on the floor with the longest continuous time period being in excess of thirty days. Out of this four or five months, Demeyer indicated he had a boat for approximately three weeks. Demeyer testified he believed the activity log, *Defts' Ex.* 8, is incorrect as far as the amount of time he spent on the floor.

Several months later, Demeyer indicates he started having problems with his right shoulder. He testified that he could not lift his right arm above his head.

When he was seen by Dr. Huskins, he was only prescribed Tylenol. Demeyer testified he knew the Tylenol would not work because it was not an anti-inflammatory. He submitted a second medical request asking for an anti-inflammatory but did not receive it.

Demeyer testified he was sleeping on a one inch thick mat on a cold, damp, hard floor with no pillow. He tried to sleep on his left side but he testified this made his left hip start hurting. Demeyer testified he asked the nurse about another mat and was told they did not give extra mats. After not getting results the first, second, and third time he asked, Demeyer states he just gave up.

Demeyer testified he tried to get access to the law library to find out how to file a § 1983 action. At the time, he had an attorney representing him on his criminal charges. Once detention center officials found out he had an attorney, Demeyer testified they automatically denied his requests for law library access even though he wanted access to file a § 1983 case.

With respect to Dr. Huskins, Demeyer testified he did not do thorough examinations. At the first visit about his shoulder, Demeyer testified Dr. Huskins just moved his arm a little. During following visits, Demeyer testified Dr. Huskins did nothing. Demeyer agrees that an x-ray constituted a thorough examination, but he believes Dr. Huskins should have ordered one sooner. Additionally, Demeyer believes that at a minimum Dr. Huskins should have given him an extra mat to alleviate some of the problem.

Demeyer asserts that he was denied access in general to the law library. He does not complain that he was denied access to this Court. Instead, he indicates he was denied access to the Arkansas appellate court in connection with his criminal case. Demeyer indicated he plead guilty to a rape charge. There was a written plea agreement and he was told he would be sentenced for forty years in prison instead of life. He entered his change of plea before a Judge. Demeyer testified he wanted to appeal the criminal conviction on the grounds of ineffective assistance of counsel. He indicates he had a public defender and just went along with what the public defender's office recommended. He felt like he had to plead guilty in order to avoid more prison time. Demeyer testified he thought he could appeal.

Demeyer indicated he was convicted on September 25, 2009. Under Rule 37 of the Arkansas Rules of Criminal Procedure, Demeyer he had ninety days to file his petition. He spent part of this ninety day period in the Baxter County Detention Center and then the Diagnostics Unit of the ADC. He had no access to a law library while in Baxter County or for three weeks while he was at the Diagnostics Unit. At Varner Unit, Demeyer indicates it took three weeks to get a pass to the law library. By the time he was transferred to the BCDC, Demeyer testified he only had thirty days of the ninety-day time period left.

Demeyer did not send any documents to the Arkansas Court of Appeals during the ninety day period. He did not ask for an extension of time. However, he did file a belated Rule 37 petition. It was denied.

Demeyer was aware of the fact that a conviction could be appealed and a Rule 37 motion filed. He was allowed access to the law library at the BCDC on March 30, 2010. Demeyer testified this was the first time he asked for access to the law library. This date was well beyond the ninety-day period. To date, Demeyer testified he had not filed a habeas corpus action.

With respect to the law library at the BCDC, Demeyer testified the books available were inadequate and there was no one to assist him.

Since he has been at the ADC, Demeyer testified he has been working as a porter which includes mopping and sweeping floors and taking out the trash. He also has worked in the kitchen washing dishes and serving food.

**Timothy Suddreth**

Suddreth, a current ADC inmate, was in the BCDC at the same time as Demeyer. Suddreth believed he was incarcerated in the BCDC beginning on October 14, 2009, and lasting almost twelve months. They were assigned to the same pod, E-pod, but did not share the same cell. The cells surrounded a common area where the inmates eat their meals. The cells were designed for only two inmates but held three or four.

The additional inmates had to sleep on the floor. Suddreth testified he had seen Demeyer sleeping on the floor with his mat less than two feet from the toilet. While inmates on the floor were usually provided with a "boat[1]" which was plastic and raised the inmate off the floor,

---

[1] Defendants' exhibit 9 contains pictures of both the boat, or "stack a bunk," and a mat.

-4-

Suddreth testified there were times he slept on the floor but did not receive a boat. He estimated that about fifty percent of the time the inmates on the floor had a boat.

### Justin Waldron

Waldron, a current ADC inmate, was incarcerated in the BCDC the same time as Demeyer. Each cell had two steel bunks. If a third inmate was assigned to the cell, the officers told the inmates where to sleep. Inmates sleeping on the floor had a ½ inch thick mattress. Every once in a while, Waldron testified you had a boat. Waldron indicated he had a boat for the last two months that he slept on the floor.

Waldron never saw more than three men in a cell. Waldron testified he could see where Demeyer slept. In the five months Waldron was in E-pod with Plaintiff, he saw Demeyer sleeping on the floor with a mat. Waldron testified that Demeyer's request for an extra mat was denied causing him to be in more pain. Waldron also recalled Demeyer on numerous occasions asking to see the doctor because of pain in his shoulders and hips.

Waldron and Demeyer both took medication. This allowed Waldron to see what medications Demeyer received. Waldron recognized Naproxen Sodium but did not know Demeyer had also received prednisone.

### Stacy Gawlik

Gawlik testified he was incarcerated at the BCDC in late 2009 and in 2010. Gawlik noticed Demeyer slept on the floor a lot. Gawlik heard Demeyer complaining that his shoulder hurting him. Gawlik was never assigned to the same cell as Demeyer.

Approximately ninety percent of the time, Gawlik testified there were three inmates assigned to a cell. Gawlik indicated he slept of the floor for the first three months he was at the

BCDC. Although he asked for a boat, he did not have a boat any time when he slept on the floor.

When someone got transferred to the ADC, Gawlik testified you just had to ask an officer if you could be moved to a bunk. Gawlik indicated the bunks were made of sheet metal with a mat on it was no softer than sleeping on the floor but it was easier to get up off of them.

### Levi Campbell

Campbell was incarcerated in the BCDC late in 2009 or 2010. He recalled the Plaintiff but was never in the same cell with him. Campbell testified the mats they were given to sleep on were approximately one inch thick.

### Zachary Campbell

Campbell was incarcerated in the BCDC in 2009 and 2010. He recalled Demeyer having to sleep on the floor although there were open bunks in the pod. Campbell testified he slept on the floor on a mat for about two weeks. After submitting requests and grievances, he did get a boat and slept in it for about four months. Finally, he was moved to a bunk.

Campbell recalled Demeyer complaining that his shoulders were hurting. However, Campbell did not share a cell with Demeyer and never saw him sleeping.

### Lieutenant Paul Carter

While Demeyer was incarcerated at the BCDC, Lt. Carter was the lieutenant jail commander. In this position, he was responsible for the day to day operation of the facility as well as supervising staff and inmates. Jail policies were established by the administrative staff. The deputies were responsible for assigning inmates to cells. The population dictated whether an inmate was assigned a bunk or the floor.

The activity report for Demeyer shows in chronological order any activities he was

involved in. *Defts' Ex.* 8. Lieutenant Carter testified the pods hold sixteen cells with two bunks in each cell. For the most part, the jail population was larger than what it was designed to hold. The pods are designated alphabetically and numerically--E-102. The cells have numerical designations. *Id.* The designation A and B are for the bunks and the designation E1 means there is an extra inmate assigned to the floor. For example, the activity report, *Defts' Ex.* 8, show Demeyer in E102-215-E1. This indicates Demeyer was in pod E102, cell 215, and assigned to sleep on the floor, E1.

Lieutenant Carter did not know the number of boats they had in inventory at the relevant time but did recall that some inmates were sleeping on the floor without boats.

Demeyer's requests for law library access on March 12th and March 29th were approved. *Defts' Ex.* 5. The law library is actually a book cart with law books on it. There is a three volume book regarding Constitutional Rights and books regarding court rules and procedure. When a request to use the law library is approved, a deputy should note in the activity report when an inmate is using the library.

When grievances or requests were submitted, they went to Captain Holly. If he was out of the office, Lieutenant Carter would review and respond. A copy of the request or grievances ix made and placed into the inmate's file.

### Former Captain Robert Holly

In 2009 and 2010, Captain Holly the captain assigned as commander of the jail. The position was above Lieutenant Carter.

To determine the jail population and how many inmates were sleeping on the floor, the daily head counts could be reviewed. If the head count of any pod was over thirty-two, there

would be inmates on the floor. The detention center has approximately a 500 bed limit.

According to Captain Holly, one pod, D-pod, had thirty-two bunks and another pod was an open barracks. When an inmate comes in, he would be assigned to an open spot. If a bunk opens up, the inmates go to a deputy and ask if they can have the bunk.

While Captain Holly believed there was an inventory on the number of boats, the inventory would not have been pod specific. Captain Holly testified they had problems storing the bunks. He knew there were inmates on the floor on mats.

When an inmate is booked in, a medical questionnaire is completed. The only condition listed on Demeyer's questionnaire was a heart condition. *Defts' Ex.* 2.

The jail uses a single form for inmates to submit grievances, requests, and medical requests. The form instructs the inmate to circle either grievance, request, or medical. *See e.g., Defts' Ex.* 4. Medical requests are forwarded to the medical staff and reviewed by a nurse. If the nurse determined the inmate needed to see the doctor, she would schedule a visit for the inmate. At that time, the doctor came to the detention center on Mondays, Wednesdays, and Fridays. Captain Holly was not involved in any medical decision making.

With respect to the law library, Captain Holly stated that requests were granted if the inmate represented himself in a criminal matter or had a civil rights case. If the inmate just wanted to improve his legal knowledge to help himself, the requests were denied. If the inmate is authority to go to the library there should be a notation on the activity report. However, Captain Holly testified that this was not always done. The activity report indicates Demeyer had access to the law library on March 30th, April 3rd, and August 18th.

### Dr. John Huskins

Dr. Huskins testified he was the doctor for the BCDC in 2009 in 2010 until November. His specialty is family practice. Among other things, he has some experience in orthopedics.

On December 28, 2009, Dr. Huskins saw Demeyer with complaints of anxiety. At the time, it appeared Demeyer was doing well so no medication was prescribed. Dr. Huskins testified it is not abnormal to see anxiety in the jail population. When he saw Demeyer, Dr. Huskins noted that his affect was good.

Dr. Huskins testified that he did not review the medical requests. Instead, he testified the nurses reviewed the requests and if they thought the inmate needed to be seen they scheduled him for sick call which was done three times a week.

Typically, Dr. Huskins prescribed a treatment for five days. If the inmate continued to have problems. Dr. Huskins testified he wanted to see how the inmate was doing.

Dr. Huskins saw Demeyer on April 19, 2010, for complaints of shoulder pain. Dr. Huskins noted a lateral decreased range of motion and prescribed Tylenol. *Defts' Ex.* 3 at pg. 2. On April 22nd, the nurse changed the prescription to Aleve. *Id.* According to Dr. Huskins, Tylenol provides pain relief with less gastrointestinal problems while Aleve has some anti-inflammatory properties.

On April 28th, Dr. Huskins saw Demeyer and it appeared that he was getting better. *Id.* According to Dr. Huskins, if an inmate does not come back for three months that indicates to him that the symptoms have improved or resolved.

Dr. Huskins did not see Demeyer again for complaints of shoulder pain until July 21st. *Defts' Ex.* 3 at pg. 3. At that time, Demeyer indicated the shoulder pain was worse if he slept

on it. Demeyer complained of problems with rotation to the right shoulder. Dr. Huskins noted that Demeyer never complained of bilateral problems. Dr. Huskins prescribed prednisone to relieve inflammation. *Id.*

Dr. Huskins next saw Demeyer for complaints regarding his shoulder on August 23, 2010. *Defts' Ex.* 3 at pg. 3. Demeyer complained of grinding in his shoulder. *Id.* Dr. Huskins prescribed Tylenol and ordered a shoulder x-ray. *Id.* The x-ray showed mild osteoarthritis. *Id.*

Dr. Huskins next saw Demeyer with complaints of right should pain on November 1st. *Defts' Ex.* 3 at pg. 4. Dr. Huskins prescribed prednisone and Tylenol and ordered another x-ray. *Id.* The x-ray revealed no changes from the first x-ray. *Id.*

According to Dr. Huskins, no doctor would recommend surgical intervention. Instead, he said the goal was to provide relief from pain caused by the inflammation.

Dr. Huskins could not recall them talking about Demeyer having an extra mat. In any event, Dr. Huskins testified he would not have authorized Demeyer to have an extra mat.

**Sheriff Keith Ferguson**

In general, Sheriff Ferguson testified he did not see grievances. Authority to run the jail on a daily basis is with the jail captain. If there is a critical issue, Sheriff Ferguson testified he would be consulted.

Sheriff Ferguson never saw Demeyer. With an average jail population of four hundred and upwards of ten thousand people booked in during a year, Sheriff Ferguson never sees most of the inmates.

**2. Discussion**

As noted above, Demeyer brings three separate claims. The claims are: denial of medical

-10-

care; denial of access to the courts; and, unconstitutional conditions of confinement.

### A. Denial of Access to Medical Care

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Demeyer was seen numerous times by Dr. Huskins. Dr. Huskins ordered x-rays of Demeyer's shoulder on two occasions and prescribed pain relieving and anti-inflammatory medications on several occasions. Demeyer's disagreement with the treatment

given is insufficient to give rise to a constitutional violation. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Additionally, no evidence was presented suggesting any delay in the provision of treatment to Demeyer or of the provision of x-rays, was detrimental to Demeyer. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976)(medical decision not to order x-rays does not constitute cruel and unusual punishment); *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(when inmate bases Eighth Amendment claim on treatment delays, he must offer verifying medical evidence establishing detrimental effect of delays). None of the other Defendants were involved in Demeyer's medical care. *See Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(prison official not involved in treatment decisions made by medical staff cannot be held liable for medical staff's diagnostic decisions).

### B. Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

While having an inmate sleep on the floor may be constitutionally permissible, *see e.g.,*

*Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir. 1996) (use of a floor mattress for thirteen nights not unconstitutional), consideration must be given to the totality of the circumstances including the length of time the inmate is forced to sleep on the floor and the health of the inmate. *See e.g.*, *A.J. by L.B. v. Kierst*, 56 F.3d 849, 855 (8th Cir. 1995)(sleeping on mattresses on the floor not unconstitutional when it was for only a relatively short period of time and then only when there was a special need). With this in mind, we turn to an examination of Demeyer's activity report. *Defts' Ex.* 8. According to this report, Demeyer was assigned "E-1" which meant he was extra man in the cell and slept on the floor for the following periods of time: from 11/19/2009 to 12/1/2009 (twelve nights); from 2/5/2010 to 2/10/2010 (five nights); from 2/15/2010 to 3/9/2010 (twenty-two nights); from 3/14/2010 to 4/20/2010 (thirty-eight days).

In general, Demeyer challenges the accuracy of the activity report. He asserts that he was on the floor for months at a time. However, Demeyer makes only conclusory allegations in this regard and does not point to any specific errors in the activity report. *See Hubbard v. Taylor*, 538 F.3d 229 (3d Cir. 2008)(having to sleep on the floor for three to seven months was not excessive) Demeyer does not allege that he was subjecting to unfavorable conditions such as the splashing or urine or feces from the nearby toilet. The mere fact that he was required on an intermittent basis to sleep on the floor does not state a claim of constitutional dimension. This is especially true where, as in this case, the bunks were hard cold steel and only covered by the same mats given to inmate sleeping on the floor. As admitted by Demeyer, the only difference between sleeping on a bunk and the floor was that it was easier to get up off the bunks. No claim of constitutional dimension is stated.

### C. Access to the Courts

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817 (1997)). The right of access requires the provision of "prisoners with adequate law libraries or adequate assistance from persons trained in the law," *Bounds*, 430 U.S. at 828, to challenge their criminal charges, convictions, and sentences directly or collaterally or to challenge the conditions of their confinement through civil rights actions, *Casey*, 518 U.S. at 351; *see also Cody v. Weber*, 256 F. 3d 764, 767-68 (8th Cir. 2001)("right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court'")(*quoting Casey*, 518 U.S. at 354-55); *Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).

Plaintiff asserts that he was prevented from filing a timely post-conviction petition under Rule 37 of the Arkansas Rules of Criminal Procedure. *See e.g., Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)("The underlying harm that the Constitution requires . . . legal assistance programs to prevent is . . . a lost, rejected, or impeded legal claim"). However, Demeyer was aware that he had ninety days to file the petition. He was also incarcerated at two other facilities during this ninety day period. At the BCDC, Demeyer did not make a request for law library access until March 12, 2010. *Defts' Ex.* 5 at pg. 1. His request was approved. His next request was made on March 29th and it was approved. *Id.* at pg. 2. At this point, the time for him to

file his Rule 37 petition had expired. Demeyer did not file a motion asking to belatedly file the motion. Defendants are entitled to summary judgment on this claim.

### 3. Conclusion

For the reasons stated, I recommend that judgment be entered in favor of the Defendants and this case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 12th day of September 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)